UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TEDDY J. VANHOY and TAMRA                    CIVIL ACTION
VANHOY

VERSUS                                       NO: 03-1090

UNITED STATES OF AMERICA                     SECTION: "J" (4)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, on September 18-19, 2006. Having considered the testimony and evidence at trial, the arguments of counsel, and applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

1.   Teddy J. Vanhoy was born on July 2, 1948. (Trial Exhibit ("Exh.") 1, p. 32).  He is now fifty-eight years old.

2.   Mr. Vanhoy obtained a Bachelor of Science degree in mechanical engineering from the University of North Carolina in 1978. In 1993 or 1994, Mr. Vanhoy obtained an Associate's degree

in liberal arts from Valencia Community College in Orlando, Florida. (Exh. 6).

3.    Mr. Vanhoy is a former officer of the United States Navy who attained the rank of Master Chief prior to his retirement in 1992.

4.    Mr. Vanhoy left the service on disability relating to a heart condition and was partially disabled at the time of his retirement. (Trial Transcript ("Tr."), Vol. I, p. 46).

5.    After leaving the service, Mr. Vanhoy held various civilian jobs including jobs as (1) a quality control specialist for Schwartz's Electronics in Orlando, Florida; (2) a contract administrator for road and highways for the Florida Department of Transportation; (3) a salesman; (4) a vo-tech teacher; and (5) and installer of security systems, video cameras, and computerized security doors for the Defense Department in Slidell, Louisiana.  Mr. Vanhoy was employed with the Defense Department in Slidell when he sustained the injuries that resulted in this lawsuit.  He has not worked since. (Exhibit 6).

6.    Mr. Vanhoy and his wife of thirty-three years, Tamra Vanhoy, currently reside in Arlington, Texas; however, at the time Mr. Vanhoy sustained the injuries that resulted in this lawsuit, he and his wife resided in Slidell, Louisiana.

7.   On October 4, 1999, Mr. Vanhoy underwent coronary artery bypass graft surgery at the Veterans Affairs Medical Center in New Orleans, Louisiana ("VAMC").(Exh. 1, p. 99)  This surgery was performed without complications. (Exh. 1, p. 33). Following the surgery, Mr. Vanhoy was placed in the surgical intensive care unit and was placed on a ventilator, which mechanically supported his breathing through an endotracheal tube.

8.   On October 5, 1999, the day following the surgery, Mr. Vanhoy was described as being "neurologically fine" and was responding to verbal commands. (Exh. 1, p. 33).

9.   Beginning in the late evening on October 5 and in the pre-dawn hours of October 6, 1999, Mr. Vanhoy became agitated and, at times, was "thrashing about in bed." (Exh. 1, pp. 202A-203).

10.   In the early morning hours of October 6, 1999, hospital personnel began the process of weaning Mr. Vanhoy from ventilator support - per protocol. (Exh. 1, p. 203).  To do so, hospital staff reduced Mr. Vanhoy's dosage of Versed, the medication being used to sedate him.  Mr. Vanhoy's level of agitation increased as the dosage of Versed was reduced.

11.   A nurse's note from 5:30 a.m. on October 6, 1999, indicates that Mr. Vanhoy was "intermittently agitated" and was

3

attempting "to pull at anything he can reach despite bilat[eral] protective devices to wrists."  Based on his agitation level, Mr. Vanhoy's Versed dosage was increased, and he was also given Morphine.

12.  The medical record indicates that Nurse Johnson monitored Mr. Vanhoy during the early morning hours of October 6, 1999, during the period of time when he was agitated. (Exh. 1, p. 203).  The medical record further indicates that a nursing shift change took place at 7:00 a.m. on October 6, 1999. Nurse Johnson gave a report on Mr. Vanhoy's status to the oncoming nurse, who was Nurse Vanessa McKenzie.

13.  There are no nursing or progress notes in the record between the time of the 7:00 a.m. shift change on October 6, 1999 and 9:15 a.m. that same morning.  It was during this time frame that the incident that injured Mr. Vanhoy occurred.

14.  Rhythm strips are used to record electrical activity in the heart at a certain time.  There are several of these strips included in Mr. Vanhoy's medical records.  One rhythm strip indicates that at approximately 8:14 a.m. on October 6, 1999, Mr. Vanhoy went into respiratory distress. (Exh. 1, p. 206).  This particular rhythm strip shows a cardiac dysrhythmia. Another rhythm strip indicates that at 8:26 a.m. the electrical activity in Mr. Vanhoy's heart stopped or slowed to the point that no

4

pulse could be detected.  (Exh. 1, p. 205).  A third strip shows that by 8:35 a.m., some electrical activity and a slow heartbeat had been restored.

15.  The endotracheal tube which had been supplying Mr. Vanhoy with oxygen had become dislodged, which caused Mr. Vanhoy to go into respiratory and cardiac distress.  The loss of the endotracheal tube compromised Mr. Vanhoy's airway resulting in oxygen deprivation.  The lack of oxygen to Mr. Vanhoy caused him to become hypoxic and to suffer respiratory and cardiac arrest.

16.  No medical personnel were present when the dislodging of the tube occurred.  A "code note" in the medical records indicates that the attending physician, Dr. James Parrish, believed Mr. Vanhoy "tongued out" the endotracheal tube. (Exh. 1, p. 206).  This note is the only notation of what steps were taken by hospital personnel to attend to Mr. Vanhoy during his respiratory distress.  The code note bears a time of 9:00 a.m. October 6, 1999, and was prepared only after the V.A. medical personnel had responded to Mr. Vanhoy's emergency situation.

17.  The medical record does not provide any information regarding when the tube became dislodged or when Mr. Vanhoy's condition was discovered by hospital personnel.  A consultation sheet in the medical record indicates that "nurses did not know the time period of extubation." (Exh. 1, p. 409).

18.  Dr. Parrish informed Mrs. Vanhoy that he was the first person to notice that the endotracheal tube was dislodged as he happened to be walking in the hallway past Mr. Vanhoy's room. (Tr., Vol. I, pp. 50-51)  Dr. Parrish said that he ran in and called the nurses.

19.  Defendant's expert testified that the ICU in a hospital such as the VAMC would typically be equipped with an alarm system that sounds whenever a cardiac monitor senses that the patient is in distress.   There is no record of an alarm sounding or whether it was responded to by the nursing staff. (Tr., Vol. I, p. 58)

20.  The "code note" indicates that upon discovering Mr. Vanhoy, medical personnel attempted to orally reintubate Mr. Vanhoy but were initially unable to do so due to a "clenched jaw."  During this period of time, medical personnel also attempted to ventilate Mr. Vanhoy using an ambu-bag without success.  After several unsuccessful attempts at reintubation, medical personnel intubated Mr. Vanhoy and his airway and heartbeat were restored. During the time from his extubation until his reintubation, which the medical records indicate was likely exceeded 21 minutes, Mr. Vanhoy was deprived of a normal flow of oxygen.

21.  Mr. Vanhoy suffered anoxic brain injury as a result of the extubation and the attendant deprivation of oxygen.  He was

6

evaluated by a neurologist at the VAMC, who recommended transfer to an intensive rehabilitation center for follow-up care.

22.  On November 10, 1999, Mr. Vanhoy was transferred for intensive rehabilitation at the Veterans Affairs Medical Center in Richmond, Virginia ("VAMC Richmond").  He was discharged from that facility on December 7, 1999, when he returned to New Orleans for follow-up outpatient care at the local VAMC.

23.  Plaintiffs' medical experts, Dr. Lawrence H. Repsher, an expert in pulmonology and critical care medicine, and Jana B. Gautreaux, R.N., a nursing expert with critical care experience, both indicated that the medical record in this case makes reconstructing the events very difficult.  There are significant gaps in the medical records that should contain nursing and progress notes.  Also, during the response to the emergency, someone from the nursing staff should have been assigned to act as a scribe, making contemporaneous and detailed notes of events as they occurred.  Instead, the medical records produced by the VAMC do not show what, if anything, the nursing or medical personnel were doing between 7:00 a.m. and 9:00 a.m. that morning.

24.  Considering that the nurses were aware that Mr. Vanhoy was obviously agitated and had been observed "pull[ing] at anything he can reach", Dr. Repsher testified that additional

7

steps should have been taken to prevent the loss of the airway that resulted, including closely monitoring the patient, and possibly additional restraints or sedation. Dr. Repsher also testified that he has never seen a patient be able to "tongue out" a properly placed and properly secured endotrachael tube. He believes it is more likely that the patient was able to pull the tube out, despite the "soft" restraints. If in fact the extubation took place, as the code note indicates, by Mr. Vanhoy tonguing out the endotracheal tube, this process would have taken a long time and should not have gone unnoticed by the nursing staff.

25. Plaintiffs' nursing expert, Jana Gautreaux, testified that she has never seen a patient "tongue out" a properly placed and secured endotrachael tube. Ms. Gautreaux further testified that Nurse Mckenzie's monitoring of Mr. Vanhoy did not meet the standard of care. Ms. Gautreaux explained that the standard of care regarding monitoring of patients in the intensive care unit usually involves checking on a patient at least hourly, but depending on the status of the patient, would involve checking on the patient more frequently.

26. Based on Nurse Johnson's progress notes (Exhibit 1, p. 203), Nurse Mckenzie and the nursing staff were clearly on notice that Mr. Vanhoy was agitated and had made several attempts to

8

pull at his endotracheal tube.  Ms. Gautreaux testified that if Nurse Mckenzie had checked on Mr. Vanhoy around 8:00 a.m. on October 6, 1999, she likely would have discovered the problem Mr. Vanhoy was having with the endotracheal tube and, therefore, would have prevented this incident from occurring.

27.  Ms. Gautreaux testified that, based on the available records and evidence, the standard of care was breached by Nurse McKenzie, who failed to closely monitor her patient, failed to observe when the endotracheal tube became dislodged, and failed to immediately respond when Mr. Vanhoy went into respiratory and cardiac distress at approximately 8:14 a.m.  Ms. Gautreaux opined that it is likely the tube became dislodged sometime prior to 8:14 a.m. because Mr. Vanhoy was becoming hypoxic by that time. (Tr., Vol. I, p.27) By 8:26 a.m., all electrical activity in the heart had stopped and no heartbeat could be detected.  It was not until 8:35 a.m., at least 21 minutes after the tube became dislodged, that some electrical activity and a slow heartbeat were restored, suggesting the reintubation was finally accomplished.

28.  Mrs. Vanhoy testified that Dr. Parrish stated to her that Mr. Vanhoy had been deprived of oxygen for approximately 14 minutes.  (Tr., Vol. I, p. 51). Presumably this is based upon Dr. Parrish's estimate from the time he discovered the endotracheal

9

tube had been dislodged until reintubation.  But the evidence convinces the Court that the patient had been in cardiac distress for some time prior to Dr. Parrish discovering the tube dislodged, most likely since sometime prior to 8:14 a.m.

29.  Dr. Repsher also testified that the medical record contains several blood gas readings taken that morning.  The reading at 5:05 a.m. was within normal limits.  The next reading, taken at 8:32 a.m., indicates a severe lack of oxygen and that the patient "had been without adequate delivery of oxygen . . . for a significant length of time."  Dr. Repsher testified this indicates "a severe degree of lactic acidosis which was also aggravated by a severe degree of retention of carbon dioxide due to inadequate ventilation."  The reading at 8:45 a.m. indicates that the supply of oxygen had returned, meaning the endotracheal tube had been replaced sometime before that time.  Based on these readings, and the rhythm strip readings, Dr. Repsher testified the patient was without the ventilation tube for between 18 and 31 minutes. (Exh.10, pp. 43-45)

30.  Considering that Nurse McKenzie was well aware of the patient's previous agitated state and attempts to "pull at anything he can reach", close monitoring was clearly required. It is likely that if Nurse McKenzie had been properly monitoring

10

her patient, she would have noticed the patient attempting to either pull out or "tongue out" his tube (a device approximately 12 inches long), and would have been able to either prevent it from being dislodged or at least would have responded immediately to the emergency when the patient began to experience respiratory and cardiac distress.   From the evidence presented, the Court finds that Nurse McKenzie breached the standard of care under the circumstances.

31.   The Court finds no breach of the standard of care by the physicians involved in caring for Mr. Vanhoy.   The coronary artery bypass surgery was performed without complications and following surgery, Mr. Vanhoy was placed on a ventilator to mechanically assist his breathing through the endotracheal tube. Throughout that day and most of the following day, Mr. Vanhoy was observed to be neurologically intact and responding to verbal commands.   The court concludes that the surgery and the initial placement of the endotracheal tube were done in accordance with the standards of medical care.

32.   The Court also finds no breach of the standard of care by Dr. Parrish or other medical personnel in their efforts to reintubate Mr. Vanhoy once they realized his breathing tube had become dislodged.   Although they encountered much difficulty in getting the endotracheal tube reinserted, under the circumstances

of dealing with a highly agitated patient, who was thrashing about and clenching his jaw, the Court does not find that the physicians were negligent.

33. The Court had the opportunity to observe and listen to Mr. Vanhoy during the trial.  He is profoundly and permanently disabled.  Mr. Vanhoy's anoxic brain injury has impaired his ability to function normally in many aspects of daily living.  He is unable to work.  Although, Mr. Vanhoy can stand and walk for short distances with the aid of a cane, walking for longer durations or longer distances requires the use of a wheelchair. In addition, Mr. Vanhoy's sight, speech and memory have been affected.  Mr. Vanhoy is mentally sound; however, he experiences short term memory loss.  Also, Mr. Vanhoy can no longer easily express himself through speaking as he has oral mandibular dystonia, which causes uncontrolled movement of his tongue and jaw.  He is very difficult to understand when he speaks.  The dystonia also affects Mr. Vanhoy's eating ability. His food must be cut into very small bits so he can swallow it rather than chewing. Eventually, it is expected he will require a feeding tube.  Mr. Vanhoy is legally blind due to brain anoxia.  He sees shadows and colors, but likely will never completely regain his sight.

34.  Dr. Cornelius Gorman, a vocational rehabilitation and certified life care planning expert, testified that Mr. Vanhoy's physical disabilities require attendant care and support services twenty-four hours a day, seven days a week, ideally from a certified nursing assistant.  Dr. Gorman also stated that maintenance therapy would aid Mr. Vanhoy in sustaining his abilities at the highest functioning level.  Thus far, most of Mr. Vanhoy's care has been provided by Mrs. Vanhoy.  She has had to give up her own job in order to care for Mr. Vanhoy. Ideally, she would like to return to work if nursing care were available for her husband during the hours she works.   At a minimum, this would entail private nursing and attendant services for approximately 12 hours per day.  Dr. Gorman testified that it is appropriate to construct a life care plan without reference to services of family members.  Obviously, there is no guarantee that Mrs. Vanhoy will be available or able to provide care for Mr. Vanhoy for the remainder of his life.  A life care plan should not capitalize upon the services of family members unless such services are valued.

35.  John Theriot, who qualified as an expert Certified Public Accountant, testified as to the estimated cost of the life care plan prepared by Dr. Gorman.  Based upon a life expectancy of 21.7 years at the time of trial, Mr. Theriot estimated the

present value of lifetime medical care and services for Mr. Vanhoy to be somewhere between $3,050,803 (based on Louisiana rates) and $4,893,502 (based on Texas rates).

36.  The government's life-planning expert, Barney Hegwood, agreed that Mr. Vanhoy requires around the clock attendant care. He estimated that a home-based life care plan would have a present value cost of between $1,492,480 and $3,992,474.

37.  Based on all of the lay and expert testimony, the Court finds that the present value sum of $3,500,000 for future medical care and services will fairly and adequately provide Mr. Vanhoy with reasonably necessary care for the remainder of his life.[1]

38.  In addition, Mrs. Vanhoy is entitled to be compensated for her past services in providing round-the-clock care for her husband since his discharge from the VAMC Richmond in December 1999.  The Court finds it is appropriate to compensate Mrs. Vanhoy at the rate of $10 per hour, which equates to $87,600 X 6.75 years (12/99 thru 9/06), for which the Court awards the total sum of $591,300.

39.  Mr. Vanhoy sustained loss of past and future income of approximately $500,000 as a result of his injuries.  However, these losses have been essentially offset by his receipt of

---

[1]     The Court has previously decided that any award for future medical care and services should be in the form of a lump sum payment. (See Order and Reasons, Rec. Doc. 76; 2006 WL 2999801).

Veterans Administration disability benefits, which the parties
agree is a non-collateral source.   Accordingly, there is no basis
to award damages for loss of past or future income.

40.   Finally, the Court finds that general damages for the
catastrophic injuries sustained by Mr. Vanhoy should be awarded
in the amount of $2 million.   However, in the light of the
Louisiana Medical Malpractice Act cap on damages applicable to
this case, this award must be reduced to a maximum amount of
$500,000.

## CONCLUSIONS OF LAW

1.   This action arises under the Federal Tort Claims Act
("FTCA"), 28 U.S.C. §§ 2671 - 2680.   Accordingly, jurisdiction is
vested in this Court by 28 U.S.C. § 1346(b).   Jurisdiction in this
Court is also proper in that, pursuant to 28 U.S.C. § 2675(a), the
claims set forth herein were first presented to the Department of
Veterans Affairs on March 5, 2001.   On February 13, 2003, the
Department of Veterans Affairs denied the claim.

2.   The United States as a sovereign is immune from suit,
except to the extent that it has waived its sovereign immunity.
FDIC v. Meyer, 510 U.S. 471 (1994).   The FTCA provides a limited
waiver of the federal government's sovereign immunity. Johnston v.
United States, 85 F.3d 217, 218-219 (5th Cir. 1996). This Act
states that "[t]he United States shall be liable, respecting the

provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

3.   The FTCA looks to the law of the place where the act or omission causing the injury occurred in ascertaining whether or not a private person would be liable under like circumstances.  <u>See</u> <u>United States v. Neustadt</u>, 366 U.S. 696, 705 n.15 (1961).  Thus, Louisiana law governs this dispute, since Mr. Vanhoy's treatment and injury occurred in Louisiana.

4.   Louisiana's Medical Malpractice Act damages cap of $500,000 applies to lawsuits brought under the FTCA.  <u>See</u> <u>Owen v.</u> <u>United States</u>, 935 F.2d 734, 739 (5th Cir. 1991).  The cap encompasses special and general damages, except for necessary medical care and services. Both parties concede these points.

5.   In a claim for medical negligence or malpractice, the plaintiff must establish by a preponderance of the evidence (1) the standard of care relevant to the medical personnel involved; (2) that the medical personnel violated that standard of care; and (3) that the medical personnel's alleged negligence proximately caused plaintiff's injuries.  <u>See</u> La.Rev.Stat. Ann. § 9:2794(A).

6.  The VAMC nursing staff who were involved in caring for Mr. Vanhoy while in the ICU post-surgery, and in particular Nurse McKenzie, breached the standard of care by failing to properly

monitor his endotracheal tube and failing to immediately respond once he began to experience respiratory and cardiac distress.

7.  As a direct and proximate consequence of this breach of the standard of care, Mr. Vanhoy sustained catastrophic injuries, including anoxic brain injury.

8.  During trial, counsel for the Government made references to Plaintiff's alleged failure to prove that any of the involved medical personnel were employees of the VAMC, such that the Government would be liable under a theory of agency or respondeat superior.  In essence, the Government argues that because it is *possible* that the involved medical personnel were independent contractors or contract employees, if that were the case, the VAMC would not be liable as employer.

9.  Counsel for the Government admitted that Dr. James Parrish, the attending physician, was an LSU resident working at the VAMC. (Tr., Vol. II, p. 44).  Counsel relies on <u>Broussard v. United States</u>, 989 F.2d 171 (5th Cir. 1993) for the proposition that the Government is not liable under the FTCA for the acts of a physician who is an "independent contractor".  The physician in <u>Broussard</u> worked for a private medical group that had contracted to operate the emergency room at a military hospital.  In the contract, the medical group and the government expressly provided that the physicians in the group were independent contractors and

that the government retained no control over their work.  In the
instant case, Dr. Parrish was a *resident in training* at the VAMC.
The fact that he was an LSU resident does not preclude him from
being considered an employee of the VAMC for purposes of the FTCA.
<u>Ezekiel v. Michel</u>, 66 F.3d 894 (7th Cir. 1995).[2]  In any event, as
to Dr. Parrish, the issue is moot since the Court has not found any
breach of the standard of care on his part.

10.  The VAMC nurses, however, would clearly be considered
employees under the control of the VAMC staff.[3]  The logic is
simple — unlike doctors, nurses do not exercise independent medical
judgment, but must follow the hospital's policies and procedures.
Louisiana case law indicates that nurses are considered presumptive
employees of the hospital.  In <u>Medical Review Panel Proceedings for
Claim of Tinoco v. Meadowcrest</u>, 2003-0272 (La. App. 4 Cir.
9/17/03), 858 So.2d 99, the Louisiana Fourth Circuit explained a
nurse is not an independent  practitioner and is always supervised
in a hospital. The Court stated:

> This Court has articulated the responsibility a
> hospital has for  the actions of  its nurses by

---

[2]     <u>Cf</u>. <u>Costa v. United States</u>, 845 F. Supp. 64 (D. R.I. 1994) (a
resident employed by a residency program and was assigned to a VA hospital was
not precluded from becoming an employee of the hospital, pursuant to the "lent
servant" doctrine).

[3]     Notably, while stating that Dr. Parrish was employed as an LSU
resident, counsel for the Government did not suggest that nurse Vanessa McKenzie
was not an employee of the VAMC ("I don't know her employment status, she may
have been an employee of the V.A.") (Tr., Vol. II, pp. 144-45).

> stating that "[a] hospital is responsible for the negligence of its nurses under the respondeat superior doctrine." <u>In re Arthemise Triss</u>, 2001-1921, p. 13 (La.App. 4 Cir. 6/5/02), 820 So.2d 1204, 1212. The hospital is presumed to have control over the actions of its nurses, whether they are agency nurses or regular hospital employees.

<u>Id.</u> at 108.

11. This is consistent with the testimony of Plaintiff's nursing expert, Ms. Gautreaux, who has extensive experience working in hospitals as a "contract" nurse. In that capacity, she is always under the supervision and control of the hospital nursing staff or charge nurse, and must adhere to the hospital's policies and procedures. She would not be considered an independent contractor.

12. Mr. Vanhoy is entitled to recover $500,000 for general damages (reduced to the maximum allowed by law); and $3,500,000 for future medical care and services (which is not subject to the cap).

13. Mr. Vanhoy is eligible for certain health care benefits under both Medicare and Tricare (formerly CHAMPUS). The parties agree that Tricare, funded from the federal treasury, is considered a non-collateral source in these circumstances. <u>See</u> <u>Kennedy v. United States</u>, 750 F. Supp. 206 (W.D.La 1990). Thus, for purposes of any past medical care and benefits paid by Tricare, Mr. Vanhoy is not entitled to recover those amounts in this case.

14. However, the disputed issue is whether the Government is entitled to any offset against Mr. Vanhoy's award for *future* care and services.  There was testimony that in light of his disability status, Mr. Vanhoy's primary health care coverage is now provided through Medicare.  Any Medicare benefits Mr. Vanhoy receives are a collateral source.  Amlotte v. United States, 292 F.Supp.2d 922 (E.D.  Mich. 2003).  The Government failed to submit expert or other evidence to show what amounts, if any, will be paid by Tricare in connection with Mr. Vanhoy's future medical care and home attendant services.  The issue of whether the Government is entitled to an offset is an affirmative defense on which the Government bears the burden of proof. See F.T.C. v. National Business Consultants, Inc., 376 F.3d 317 (5th Cir. 2004) (party asserting affirmative defense bears the burden of proving the defense); Crescent Cigarette Vending Corporation v. Toca, 271 So.2d 53 (La. App. 4th Cir. 1972)(party pleading affirmative defense of set-off bears burden of proving the defense).

15. The Court concludes that the Government failed to satisfy its burden of proving its entitlement to an offset for Tricare benefits against Plaintiff's award for future care and services. Because the Government introduced no real evidence on this issue, the Court declines to speculate by reducing the award for future medical care and services without knowing the amounts by which the

Government contends the damages should be reduced and without being afforded some proof of those amounts.  See Reilly v. United States, 863 F.2d 149 (1st Cir. 1988); Cf. Siverson v. United States, 710 F.2d 557 (9th Cir. 1983) (district court did not err in finding that the Government had failed to sustain its burden of proof as to the amount of benefits the plaintiff was expected to receive in the future).  Therefore, no offset based on potential future Tricare benefits is appropriate.

16.  Mrs. Vanhoy is entitled to recover $591,300 as compensation for her care of her husband through the date of trial.

17.  Plaintiffs are entitled to judgment against the United States in accordance with these findings and conclusions, plus legal interest on the judgment from the date of filing of the transcript of the judgment with the Secretary of the Treasury, in accordance with 31 U.S.C. § 1304 (b)(1).[4]

New Orleans, Louisiana this the 30th day of October, 2006.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

---

[4]     Plaintiffs have the burden of filing the transcript of judgment with the Secretary of Treasury.  See Dickerson v. U.S., 280 F.3d 470 (5th Cir. 2002); Moyer v. U.S., 612 F. Supp. 239 (D.C. Nev. 1985); Rooney v. U.S., 694 F.2d 582 (9th Cir. 1982).